Good morning, ladies and gentlemen. Our first case for this morning is Gregory Rahn v. Board of Trustees of Northern Illinois University. So we'll hear from you, Mr. Rosati. Good morning, Your Honor. It's Fabian Rosati on behalf of the appellates Gregory Rahn and Jenna Metrix. This case comes before the court on the issues of copyright infringement and discrimination pursuant to Title VII. Relative to the copyright claims, there are two main infringements. Before you get into the actual merits of your argument, I was wondering if you could tell me whether there is a full copy of these ISYE 100 class notes in the record someplace. We couldn't find that, so maybe we just out of the 13,000 pages missed it. It's very voluminous. The entire actual copyright is in there. But are the class notes themselves, the things that the bookstore was selling past the date? Yes, they are. Well, if you could furnish us with a reference to that, that would be helpful. Maybe you can do it on rebuttal. Okay. So to address that point, these three volumes are part of the actual copyright. These are sold as a packet by the bookstore? Correct. There were three individual packets, volumes one, two, and three that comprised the actual copyright. The original copyrighted work was But these were not submitted to the Copyright Office or anything? From my understanding, they were derivative works. They were wholly included. The copyright work was originally a Word document. In 2004, Genometrics And the Word document was owned by Genometrics? Correct. The Word document was owned by Genometrics. In 2004, this Word document was transferred into PowerPoints to be used at NIU and Genometrics for the Institute of Performance Excellence Program. Now these PowerPoints were created for a commercial purpose, for that use. Later, these PowerPoints were split up into three printings, ISYE 100, volumes one through three. And a cover page was placed over them. Could I interrupt you, please? I'm sorry, but you've raised two copyright claims. And the first is a challenge to the distribution of the PowerPoint presentation. And Mr. Rahm asserts that he was coerced into providing the PowerPoint. I would like, as long as you mention the PowerPoint, to get this off my mind. What's the evidence of the coercion? Well, the ISYE 100 infringement is separate and distinct from the risk management, which Your Honor is alluding to here. It's a separate PowerPoint. The risk management notes are separate and distinct from the ISYE 100 notes. So could we think of it as the risk management being the ones related to the Exelon contract and the ISYE 100, the bookstore, essentially? Exactly. So going back to the bookstore, the ISYE 100 Six Sigma series. If you look at it this way, the bookstore ISYE 100 one through three is Six Sigma. The risk management is Exelon. Those are two separate and distinct violations. So the PowerPoints were split up into these three volumes. A cover page was placed over each volume. It clearly states, Essentials for Manufacturing Systems, written by Gregory E. Rahn, Gina Rahn. It has a copyright mark with Genometrics logo. This was first printed in the fall of 2005. In the fall of 2005, Gina Rahn did not teach. Forgive me, but are we getting to the coercion? I think you should go back and talk about the risk management materials, since that's what Judge Roper is asking you about. The risk management materials, it was a contract negotiation between Exelon and NIU. The point of contact at Exelon was Promote Vora's Defendant Administrative Assistant. She referred Gregory Rahn to an individual named Yusoff Alladin to discuss potential risk management seminars to Exelon employees. They had a meeting. They discussed the potential issues that would be presented during this seminar. Subsequent to that meeting, Ms. Thigpen, the point of contact at Exelon, contacted Ms. Simmons, advised her, we'd like to move forward with Gregory Rahn to teach this risk management course. Shortly thereafter, Mr. Rahn began receiving calls from Ms. Simmons saying that we want your entire risk management slides before we can finalize this contract. Greg advised that prior to this date, he had conducted external programs through NIU with Debbie Brew, the former director of external programs at NIU. She never required the disclosure of his materials prior to a contract sign-off. He was clearly working for NIU on the project for Exelon, which is demonstrated by the facts that Exelon contracted with and paid NIU. And then NIU paid Rahn. That his supervisor would view the PowerPoint is, to me, totally unremarkable. Where is the coercion? Well, these materials that were going to be used for this external program, they were not part of Greg's undergraduate assistant professorship. That may be, but it was still NIU. And I have to say, at the next level out, it seems to me completely unremarkable that Exelon would want to see the proposed presentation before they finalized the contract. If it doesn't happen to be addressing what they want, why should they buy it? Well, they had discussion, and that's the point. There was nothing in the record that suggested that Exelon was unhappy with these slides. Well, there's a lot in the record that Exelon is unhappy. Other than Exelon, other than NIU employees, no one from Exelon contacted or reached out to Greg to give him any inclination. Why would they, though? Why would they? They'd be jumping over NIU. I mean, that would be totally improper. The point of contact at Exelon, Thigpen, and the point of contact at NIU, Thigpen advised Simmons to contact Greg regarding the contracting. In other words, they wanted to move forward with Greg after he met with Yusoff Alladin, who was the primary engineer at Exelon. But then when Thigpen and the people at Exelon reviewed the materials, not only did she say, this isn't what we want, but then when Ron tries to contact her directly, she asks NIU to have him stop doing that. If you take a look at the date of that letter, that letter is dated December 7th, 2007, some 10 months after Ms. Simmons advised Greg that Exelon did not want to move forward with the contract. No one at Exelon ever told Greg they were unhappy with anything that he produced. This letter wasn't disclosed during discovery either. But we're dealing with NIU, which was proper. Do you see why we can't get to C by forgetting about B? Well, I understand the point, but this material, this evidence was requested through two subpoenas to Exelon, one to NIU. That letter, dated March 3rd, 2007, was never disclosed. It was only substantiated or foundation attempted to be made by Ms. Thigpen's affidavit. We had issued subpoenas to Exelon, requesting any and all materials relative to this issue, this contract. They advised us that they didn't have anything in their possession. It was only until after the discovery closed that we get this letter dated some 10 months after Greg was advised by Simmons that Exelon did not want to move forward, that it came about. Is the only evidence that you presented of NIU intellectual property policy, the policy from 2011, which of course would be outside the time frame that's at issue, because even if that policy states that it was effective in 2007, what evidence is there that Mr. Rahm signed a contract or other agreement with the university while the policy was in effect? Because I couldn't. I'm not clear on the policy. You're looking for a written agreement. This copyrighted material, Greg maintained his exclusive rights pursuant to the Copyright Act. There was never an agreement between Greg Rahm and NIU that he was going to allow the use of these materials for educational purposes. They were commercial in nature. They were created before his employment, so he maintained his interest in those materials. Well, Judge Rogner may have some more questions, but why don't you continue and discuss. No, I'm processing. Discuss the bookstore side of these things. I gather as to those materials, the actual copyright is held by the company, and the company is still there, but there you have the question, once they're compiled into these teaching materials, why is it not a work for hire? You have questions about consent to its use. Correct. Well, pursuant to the Copyright Act, Section 17 U.S.C. 106.2, both Gina and Greg maintain their exclusive rights. Gina is not a plaintiff here. Her suit is severed, so he can't assert her rights. He can certainly assert his own rights, and to the extent Jenna Metrix is a plaintiff, it can assert its own rights. Correct. And as a 50% owner, Gina and Greg were both owners of Jenna Metrix. Shareholders don't normally assert rights of entities, so we need to be. Well, Jenna Metrix allowed the use of the materials at the bookstore. Here's what, I mean, it seems to me that the district court's concern was that the policy that I was alluding to a minute ago is not a written agreement signed by both parties, and as that was the basis of the district court's determination, I still need to have that addressed. Well, the issue is there was no need for an agreement because Gina never obtained sole possession of that material. That was Jenna Metrix's copyrighted work, and supporting that is the fact that Gina never taught that course, so she never did it in her employment capacity with NIU. She never used this material as part of her teaching at ISYA 100. She never taught the course. But that's the evidence that we would need to rebut your work for hire argument, and there are no cogent legal arguments on that issue that I could discern. The note packet was not printed until the fall of 2005. So the question is what's the baseline rule and what's the exception? If the baseline rule is that it's a work for hire once it's put together and you need a written document taking that away, that's one thing. If the baseline is it's theirs and then you need some sort of written agreement to make it NIU's, that's a different thing. Well, that's our point. There was no work for hire. In other words, the work was already created. It was just allowed to be sold at the bookstore by Jenna Metrix. It wasn't created in anyone's employment capacity at NIU. And you keep going back to the fact that it was created in 2005, long before it goes to the bookstore. Correct. It was created in the fall of 2005. At that point, Gina didn't even teach the course. Another professor selected that textbook to teach his course. So it was commercial in nature. No one ever notified the book. I understand Gina eventually writes a letter saying, I'm withdrawing all permission to use these materials. But is the bookstore itself ever directly notified about this, or was there just some hope that it would move through the chain? Sure. In July of 2013, a 30B6 deposition was taken of the individual most knowledgeable relative to this issue, the sales of these books. This individual's name was Donald Turk. Donald Turk testified that the bookstore knew as far back as 2007, the fall of 2007, that Gina didn't want them to use the book. But just not wanting them to use the book isn't the same thing as Gina communicating to them. You did have a license, as it were, to distribute this, and now you don't. This is a big issue for academic bookstores. They deal with copyrighted materials, in-class materials all the time, and they have to keep this very straight, and the only way they can do it is if things are in writing. Correct. She advised Joe Beddorf directly, verbally, the individual professor that was using that book, in the spring of 2007, you're no longer permitted to use it. Then she wrote the letter to Mr. Alladin, defendant Alladin, who is the provost of the university. He's the provost, and I'm trying to find out if there's any letter that goes to the bookstore in addition to this letter to the provost. Well, there was that e-mail to the provost. Gina had advised both Promote and Omar. They both testified that once they knew that Gina didn't want them to use it, they told the bookstore, you stop selling that book. This was in the fall of 2000 and spring of 2008. That book, even after they testified, was still sold. In fact, we have royalty documents from Omar Greyhead requesting royalties during the period of time that they had actual knowledge that they weren't to be selling those books. But, of course, the defendant's argument is that the class notes were prepared as part of her job as a professor because NIU paid professors for classroom preparation as well as teaching materials. She never used them to teach. They were already copyrighted. But that's her case. I mean, other people used them to teach. We're not worried about Gina here. Genometrics never used them to teach. Genometrics is a company, and it doesn't teach. Nor did Greg Rahn. But it doesn't mean that you can't create teaching materials. Sometimes in a whole department, maybe one member of the English department creates teaching materials and everybody else uses them. Well, these materials weren't created for educational purposes. They were just extracted. Well, they were assembled into an educational document, though, right? They were permitted to be sold at a university for the use of people. Right, they were assembled into a document. Well, I mean, if you want to save a little rebuttal time, I would recommend you do that now. Well, this is discrimination we haven't addressed. All right. I will, if anybody has any questions about that part of the case, you can address them. Well, I do. Please answer, Judge. You know, in the brief, you've argued that Rahn's qualifications were comparable to Chen's, and so Chen's would not have, you know, been hired absent some sort of racial animus. But you fail to point out in the record that you made that argument to the district court, except to point to some facts in the statement of undisputed facts. But the district court held that you had failed to respond to the argument at all. So on appeal here, you need to demonstrate that you actually argued it below, and where will we find that? Well, we found in the last three pages of the discrimination brief and summary judgment, there, as well as the fact, again, the statement of facts points out that there were patents that were not considered to be publications, and in fact the policy requires that patents are equivalent to publications. That wasn't argued by the defendants at the lower level. So the last three pages of the response to the defendant's motion for summary judgment. And secondly, there was direct discrimination. So the head-to-head comparison between Greg Rahn and Chen with the white male comment that was witnessed by two individuals. That's one of the issues that was kind of not really addressed by the district court or defendants, whether or not there was a direct discrimination. By a decision maker. By a decision maker, correct. And furthermore, whether or not Greg was considered a minority in the class. Our argument that he was considered a minority. And therefore there wouldn't be a heightened burden to demonstrate that NIU was that unusual employer that discriminated against the majority. Our argument is that Greg was a minority. As he was a white male, everybody else was not. Well, in light of the fact that it was the committee and not Vora that came up with the hiring matrix, wouldn't that make Vora's comment with regard to not hiring another white male just a stray remark? That was all due to Vora and Omar's meddling. They had no business meddling prior to that stage. He came in and called an emergency meeting and advised. The reason for that was that he testified or he believed that he was shocked that Gina was sitting on the committee when everyone knew, all the decision makers knew that Gina and Greg were married. Isn't that just common sense that you don't have a committee with your wife on it that chooses? NIU doesn't have an anti-nepotism policy. And she wasn't choosing. She just sat on the committee. All right. I think you better leave it at that for right now or you really will have no time. So we'll hear from you later. And now Ms., do you pronounce it Wickern? Wickern. Good morning, Your Honor. I just want to please the court. Assistant Attorney General Nadine Wickern on behalf of the defendants To start with answering Judge Wood's question, I don't think that the course packets are in the record. I could not find them either. The only thing that's in the record are the cover pages. We saw the cover pages, but that doesn't really get you too far. No. Yeah. So that's all I think that's in the record as far as the course notes go. And before you go any further with that, let me then just ask from the bench, since we don't want to waste this time, that if both parties could simply furnish the court within, you know, three days, the references to the record that we should look at, that would clarify this once and for all. For the course notes? For the course notes, yes. The course packets that are the focus of that part of the copyright claim. Yes, Your Honor. And turning to that claim. Yeah, I would like you to focus on that claim because that one, given particularly Gina's letter saying don't use this anymore and use after that date, it strikes me as something that needs more clarification. Certainly. And just to start, the thing that was copyrighted was the Tri-Affinity Six Sigma series. From that, Regina and Ron made that Essentials for Manufacturing Systems, which is the piece of paper that opposing counsel showed the court. So Essentials for Manufacturing Systems is a document or an exposition itself about how you... Right, and they used that packet of materials to teach the courses in 2004 and 2005 to the university professors. Do we know if there's anything in this packet other than just a straightforward reproduction of Essentials for Manufacturing Systems? Is there commentary, questions? Because I don't believe they're in the record, I have no idea. You don't know. And then from there is what the course notes were made. Regina took that second piece of document and made course notes into them, so just to set the stage for what is actually being discussed. Now, the use. We acknowledge that Regina verbally told Bittorf to stop using the packet. Could I just... I mean, I hate to belabor this, but if the packet... Well, first of all, if the packet's not in the record, I think we have a whole different layer of problems. But let's hypothetically think that the packet is really nothing more than a reproduction of Essentials for Manufacturing Systems. It's just a reproduction as though somebody took, you know, an antitrust casebook and just reproduced the whole thing. Well, at that point, the old copyright is the relevant copyright. If it's been used to create a new document, then you have a more complicated question under the copyright laws, which is whether this new document that incorporates copyrighted material is itself a derivative work or is it copyrighted or whatever it may be. Yeah, and instead of arguing at summary judgment about whether this was, you know, copyrighted material, we focused on the defenses, the work for higher defense and equitable estoppel. And part of our equitable estoppel argument is that Regina did not properly enforce her cease and desist. And even the cease and desist that she did give was weak. She verbally told Bittorf, who is not a defendant here, to stop using the packet, and she wrote one sentence in essentially a four-page email to stop, and she doesn't even refer to the exact packet that's being... Did you ever request the entire packet? Did you ever request that? In Discover, yeah, we asked for all of these things. Did you ever notice that you didn't get it? Well, as you might have seen from the summary judgment papers, basically when the response to summary judgment came in, what we got looked just like that, which is just pages and pages that run into each other of PowerPoint presentations. So it was a little difficult to discern, you know, what we were actually looking at. And as this court can tell from looking at the record, it's hard to know because there's not an Exhibit A and an explanation for what it is, an Exhibit B and an explanation of what that is. So, you know, I don't think we noticed for a while that some of the things that we requested were missing, but we believe that summary judgment was proper on the defenses that we could discern from what we received.  Neither Regina, Ron, nor Jenna Metrics, you know, some representative of them, ever contacted the bookstore to tell them to stop selling this packet. Well, that was my question. You know, why is contacting the provost, who presumably is over everybody, not something that would be a reasonable step to take as opposed to trying to figure out everybody that the provost might be talking to, department chairs, the bookstore, whatever? And even when the provost received that, he contacted the department and told them, you know, stop using this packet. And then after the next semester, they did stop using it. But the bookstore kept it up, though. Right. And he's not a defendant here. Grayeb, Fora, Alden, there's no evidence about Bond, by the way, all told Bittorf to stop using the packet. So they did try to carry out Regina's wishes. So is the bookstore a component part of NIU, or do they contract with somebody else to run it? It's part of the university. It is part of the university. Just as an aside, forgive me, but does the university have an anti-nepotism? You know, we submitted the policy that's part of the university's policy on anti-nepotism. My opponent argues that that's the Board of Trustees policy, but I'm not sure why that makes a difference. He did sue the Board of Trustees, and that is one of the policies. And besides, as we've argued, it's common sense that you wouldn't want a wife sitting on a committee that her husband has applied to that position. Or maybe you would. Maybe I'd have a higher job if that were the case. But, you know, even if there wasn't this policy, we think it's a matter of common sense. But we submitted a policy that the university Is it called conflict of interest, or was it called nepotism? I'm wondering if we're being picky about the name. It's at page 1182 of the record. It's paragraph 8. It's called Family Relationships. And it says faculty and administrative employees are selected for employment and promotion without regard to relationship by blood or marriage in accordance with the appropriate qualifications for the performance of specified duties. So even that first sentence references faculty. So this is about the university's faculty. And then it goes on to say, however, no individuals shall initiate or participate in personnel decisions involving dot, dot, dot spouses. So I believe that policy makes it clear. That sounds pretty clear. You know, on the PowerPoint presentation claim, there's absolutely no evidence that You're talking now about the Exelon side of things? Correct. That the PowerPoint was used or distributed in any way by any of the defendants in that claim. Surely reading something can't be an infringement of a copyright. Correct. And there's no evidence of any subsequent work being created based on that PowerPoint presentation. The allegation in the complaint was that Ciceratti, who was a professor at the university who ultimately did provide the training to Exelon, had used the material. He did, yeah. Right, and employees of Exelon and the university submitted evidence that that PowerPoint presentation was not used by Ciceratti. And Thigpen's affidavit even says, you know, it wouldn't make any sense for that PowerPoint presentation to be used given that Exelon didn't think it was good enough in the first place. And there actually was evidence that Exelon informed Ron himself that his work was unsatisfactory because the initial outline he even submitted to Exelon sparked them to have a conversation with him to say that it didn't reflect the training that they had been asking the university to provide to its employees. It's just not what they had in mind. Whether it was good for something else is a different issue. If Ron signed a contract to work at NIU and NIU included in its employment policies that it would not claim a copyright interest in class notes, would that be sufficient, do you think, to constitute the written agreement with respect to the work for hire doctrine? If there was some evidence of the written agreement or an argument, an argument on that has never been made by my opponent. He's never argued that there was a written agreement between them. That's what I was trying to get to. Precisely. I mean, there is a case, and I'm sure there is evidence, where that kind of argument could be made, but it just hasn't been made here. Could I just go back for a moment on the issue of the record? Did Judge Capalla have the entire record with regard to the course materials or not? My understanding is he had what we have. So just the cover sheet. Right. And again, probably why he too focused on the defenses to the claim, including the work for hire doctrine. Well, you'd have to peruse all 13,000 pages to figure out whether you had this or not, and that is untenable. And as for that- It violates the federal rules of appellate procedure, among other things. Exactly. Which we argued in our brief. Just quickly on the race discrimination claim, as our brief sets forth, taking for purposes of summary judgment that the statement that was made, we believe that the other evidence overcomes that evidence, if that is, in fact, evidence of race discrimination. Yeah, but with respect to the argument that Chen would have been hired regardless of any racial animus based on his qualifications, did you make that argument in your opening memorandum in support of summary judgment, or was it first clearly made in the reply? I believe we made it in our opening that Chen was more qualified, that he was actually the one that was voted, had the highest amount of votes even on the first round of voting before the new metric. So after the new metric, though, everybody's back in the pool, including Mr. Ron. All 82. All 82 are back in the pool, and there's just a new way, a more trackable way, if you will, of saying here's your publications, here's your teaching experience, here are your degrees, whatever else they put in there. Correct, and it was based on the criteria that was in the position announcement. And my opponent talks about his ability to attract outside money to the university, and on the metric itself, which is at pages 1113 and 1114 of the record, it shows that actually Chen and Ron, that was a category in which they received the same score. So, you know, in that category, they were tied. However, all the other categories, Chen received a higher score than Ron, and that was, you know, why he ended up in the final pool of three that the committee interviewed and then was the one that was recommended to Vora as the person that should be hired for the position. So we didn't argue about the ability to attract money because that was a category in which there was, you know, pretty comparable evidence for the two of them. Finally, on the idea that the committee was intimidated by Vora, there was only evidence from Kuvert that she felt intimidated, but even that evidence doesn't go very far because she testified that when she applied the metric to Ron, he was eliminated based on the metric. So she didn't testify... He was only what? I'm sorry. He was eliminated from consideration... Based on the metric, and she didn't say, I didn't vote for him because I was told by Vora not to vote for a white male. She said, I applied the metric, and he was eliminated. So even that evidence of intimidation that Kuvert presented doesn't draw a reasonable inference that race played any part in the decision-making process. And as we made in our brief, an argument that Vora wasn't the final decision-maker that eliminated Ron. He was the ultimate decision-maker on who was hired, but Ron was eliminated before he even got the chance to make that decision. I gather their theory is really that had Vora not intervened, the initial screening results of the first round would have been the ones that the committee went forward with, and Ron does make it into the finalists at that point, and it's only after Vora's intervention that the whole thing gets thrown away, and they start over again. Right, but even in that first round of votes, Chen again received the most votes, and also when... And Regina was on the committee. And Regina was on the committee and voted. He got three votes, and it's Kuvert, Regina, and... Moraga. Moraga, yeah, right. And so his wife on the committee voted for him, his teaching assistant on the committee voted for him, and Moraga. So, you know, there's a lot of arguments about whether Graeb had a vote on the committee or not, but there's no evidence that he had any racial animus or that he did anything to infect the committee's decision on a race...for a race-based decision. Would the anti-nepotism policy include someone's teaching assistant? No, I don't think it does. It's called family relationships. Just family. Just family relationships. But even with that first vote, if you look at Chen's qualifications versus Ron's, in light of the position announcement and the metric that was created, Chen obviously comes out on top both before and after the metric was imposed. So our argument is that he would have been hired anyway, and thus the statement that was made by Vora that we're taking as true for purposes of summary judgment was not a proximate cause of Ron not being hired to the position. Turning really briefly to retaliation, if there are any questions on that, the district court found that Ron waived that claim. There's been no argument in this court that that was an abuse of discretion. Well, it wasn't in the EEOC charge, right? Correct. And it gets short shrift otherwise. Correct. In our summary judgment memorandum, we argued exhaustion and the merits of the retaliation claim in response to that. In the reply brief, Ron merely offered a few sentences on exhaustion and didn't address the merits. Still has not addressed the merits before this court, and so there's a whole host of reasons why that claim has been forfeited. Unless the court has any further questions, we'd ask that you affirm the grant of summary judgment for the defendants on all four of the claims. All right. Thank you very much, Ms. Wickern. I think you have about a minute, Mr. Rosati. A minute's not going to get me too long, but I did address a lot of the issues that were discussed just now. The main point I want to make is Gina never used these ISYE 100 notes in 2004 and 2005. My counsel just argued that she had, in fact, taught that course and used those materials. That's just not the case. It's not in the record. It's not supported by the record. Retaliation was addressed in response to the summary judgment. The last three pages of our memorandum. Also, the NIU grievance that Greg made was attached to the EEOC complaint, just because of the checkmark, and there's case law to support it. We argue in our brief it was not marked. It does not waive Greg's retaliation claims. So we believe that those exhibits that are attached to the statement of facts as well as the last portion of the memorandum are sufficient to overcome defendant's summary judgment motion. Lastly, the plaintiff requests that a directed verdict be entered against the 369 willful infringements against them, maximum statutory amount, and for the remaining issues to be remanded to the lower court for further proceedings. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.